## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Allison B. Smith, ) | |
| ) | |
| 4557 Akron Street ) | |
| Temple Hills, MD 20748 ) | |
| ) | |
| *Plaintiff*, ) | Civil Action No. _____ |
| ) | |
| vs. ) | |
| ) | |
| Loretta E. Lynch, the Attorney General of the ) | |
| United States, ) | |
| ) | |
| 950 Pennsylvania Avenue, N.W. ) | |
| Washington, DC 20530 ) | |
| ) | |
| *Defendant*. ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### I

### INTRODUCTION

1.     Plaintiff Allison B. Smith, a Program Support Assistant with the Department of Justice's Executive Office for United States Attorneys ("EOUSA"), brings suit for her employer's multiple denials of her reasonable accommodation requests, complete failure to engage in an interactive accommodation process, placement in non-pay status during the accommodation process, discrimination based on race, and flagrant disregard of applicable federal law and regulations.

2.     Ms. Smith's successful 30-year career in federal service has been placed in jeopardy by her employer's actions and inactions and she has suffered serious physical, emotional, and financial harm.

3.      In 2012, Ms. Smith was diagnosed with osteoarthritis and degenerative spondylolisthesis in her back and, in 2014, Ms. Smith was diagnosed with osteoarthritis in both of her knees after she suffered a degenerative meniscal tear with chondromalacia in her left knee. For five months in 2014, Ms. Smith temporarily lost the use of her left leg.

4.      During this period, Ms. Smith repeatedly asked her supervisors, Dayle Elieson and Karen Winzenburg, for reasonable accommodations that would allow her to work full-time. Her supervisors repeatedly denied these reasonable accommodations without engaging in the required interactive process.

5.      Ms. Smith continued to request reasonable accommodations for her disabilities throughout 2014 and 2015.  Her supervisors denied these accommodations without engaging in the required interactive process and after numerous delays.

6.      As a result of these denials, Ms. Smith was forced to continue working, which exacerbated her disabilities, risking irreparable harm, and to take around 667 hours of leave without pay.

7.      Ms. Smith is African-American.  During 2014 and 2015, Ms. Smith's supervisors denied her reasonable accommodations and subjected her to a hostile work environment because of her race.  Ms. Smith was denied reasonable accommodations while a similarly-situated Caucasian employee was granted multiple accommodations to take care of family members.  In addition, Ms. Smith's supervisors increased their surveillance over her, overloaded her with work assignments, and effectively denied her lunch time.  As a result of this discrimination, Ms. Smith suffered severe emotional distress.

8.      Ms. Smith's allegations of discrimination are consistent with the testimony of all other African-Americans— including her former supervisor— who worked under the same supervisors, Mss. Elieson and Winzenburg, during the same period.

9.      At the time of Ms. Elieson's hiring, Ms. Smith was one of four African-American employees in the section, including Katrina Jones, Renee Parker, and Debora Cottrell.  All were support staff, except Ms. Cottrell, who supervised them as the Administrative Program Manager.

10.     All four, Mss. Smith, Jones, Parker, and Cottrell, allege that they were subjected to racial harassment and discrimination by Mss. Elieson and Winzenburg.  Ms. Jones transferred to a different job due to the constant racial discrimination.  Mss. Cottrell and Parker both filed numerous EEO complaints.  Ms. Cottrell was forced into retirement after filing and settling her complaint of discrimination.  Ms. Parker was terminated from federal service after filing her second EEO complaint and in April 2016, she filed a complaint in district court.  Ms. Smith is the sole remaining African-American in the office who was employed at the time of Mss. Elieson and Winzenburg's hiring.

11.     This suit is brought under the Rehabilitation Act, 29 U.S.C. 791, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq.*, and its implementing regulations.  Ms. Smith seeks declaratory and injunctive relief, and compensatory damages.

## II

## JURISDICTION AND VENUE

12.     This Court has jurisdiction under 28 U.S.C. 1331, 1343(a)(3) (federal question), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-5(f)(3) and 2000e-16(c), and the Rehabilitation Act, 29 U.S.C. 791.

13.     Ms. Smith has exhausted all administrative remedies available to her.  Ms. Smith filed an EEO complaint with the Department of Justice's Executive Office for United States

Attorneys ("EOUSA") (EOUSA Agency Complaint No. USA-2014-01036) on December 4, 2014. EOUSA accepted the complaint and assigned it for investigation. On July 15, 2015, the Complaint Adjudication Office received Ms. Smith's case file for issuance of a Department of Justice final decision. Ms. Smith received the final agency decision on March 31, 2016.

14.     This Court has jurisdiction over EOUSA Agency Complaint No. USA-2014-01036, because the agency has issued a final decision and no further administrative appeal has been filed. *See* 42 U.S.C. 2000e-16(c); 29 C.F.R. 1614.407. Fewer than 90 days have elapsed since Ms. Smith received the final agency decision on March 31, 2016. *See* 29 C.F.R. 1614.407(1).

15.     Venue properly lies in this Court pursuant to Title VII, 42 U.S.C. 2000e-5(f), because plaintiff's claims arose within this judicial district and 28 U.S.C. 1391(e) because defendant's principal offices are in the District of Columbia, plaintiff was employed in the District of Columbia, plaintiff's supervisors had their offices in the District of Columbia, and the employment decisions affecting plaintiff were made in the District of Columbia.

### III

### PARTIES

A.     **Plaintiff**

16.     Plaintiff Allison B. Smith is a United States citizen who resides at 4557 Akron Street, Temple Hills, Maryland 20748.

17.     Ms. Smith works as a Program Support Assistant in the Evaluation and Review Staff ("EARS") of the Executive Office for United States Attorneys in the United States Department of Justice. She is a GS-9, step 10.

4

**B.      Defendant**

18.      Ms. Smith sues defendant Loretta E. Lynch in her official capacity as the Attorney General of the United States, head of the United States Department of Justice ("DOJ"), and chief law enforcement officer of the federal government.  At all times relevant to this action, the DOJ has been an executive agency, as defined by 5 U.S.C. 102 and covered by Title VII, 42 U.S.C. 2000e-16(a), with headquarters in Washington, DC. The DOJ employs over 50,000 employees across the United States, including the District of Columbia.

IV

FACTS

19.      Ms. Smith is 52 years old and has had a 30-year successful career in federal service.  She began as a student aide at the Department of Defense ("DOD") in 1986, when she was 22 years old, and then she quickly obtained a permanent position at the DOD's Natural Resources Branch in the Operations Division.  Ms. Smith remained there for 13 years as an Office Automation Secretary.

20.      Ms. Smith was very successful in that position.  However, there was no promotion potential within the office.  Therefore, Ms. Smith left the DOD in 1999 to join the Evaluation and Review Staff ("EARS") of the Executive Office for United States Attorneys in the United States Department of Justice as a Program Support Assistant.  She joined with a promotion to the 7th paygrade in the General Schedule ("GS") pay-scale.  She has been an employee of EARS since that time.

21.      The primary function of EARS is to coordinate, direct, and oversee evaluations of United States Attorneys' offices every three years.  The evaluations cover financial management, third-party payments, and acquisition management. As a Program Support Assistant, Ms. Smith's primary responsibility is to provide administrative and analytical support to EARS staff.

Ms. Smith's duties and responsibilities include tracking expenditures, compiling and editing statistical data and preparing reports, analyzing and evaluating current office systems, and making travel arrangements.

22.     Beginning in the early 2000's, Ms. Smith signed situational telework agreements, allowing her to work from home, on an annual basis. Her supervisor, David Tait, countersigned these agreements every year, acknowledging that Ms. Smith could telework if circumstances arose that necessitated such an arrangement.

23.     For example, Mr. Tait allowed Ms. Smith to telework when she had temporary disabilities. In September 2006, such a situation arose. Ms. Smith had necessary surgery on her right pinky toe. Ms. Smith has had problems related to collapsing foot arches since the ninth grade. After this surgery, Mr. Tait allowed Ms. Smith to telework for more than two weeks.

24.     Ms. Smith received positive feedback on her work performance while teleworking. Ms. Smith's annual performance review for 2006 was completed in February 2007. Mr. Tait served as the Rating Official for this review and rated Ms. Smith "outstanding," the highest rating, in all three of her Critical Performance Elements ("CPE's"). The three CPE's were: "Provides office management to [EARS]," "Provides administrative support to [EARS]," and "Provides evaluation and program support to [EARS]."

25.     In around 2008, Ms. Smith received a disabled license tag and a "Disabled Persons Parking Identification Placard" from the Motor Vehicles Administration, because she had difficulty walking as a result of the problems related to her feet.

26.     Ms. Smith invested in her career and personal development. In 2008, Ms. Smith began utilizing the Department of Justice's Tuition Assistance Program to take classes and

obtain a bachelor degree.  In June 2011, after three years of balancing her school and work responsibilities, Ms. Smith received her Bachelor of Science degree in Computer Programming.

27.     During this time, Ms. Smith continued to utilize her situational telework agreement when temporary disabilities arose.  For example, in November 2009, Mr. Tait again allowed Ms. Smith to telework for two weeks after she had surgery on her left pinky toe.  Mr. Tait promoted Ms. Smith while she was teleworking.

28.     Ms. Smith continued to perform above and beyond what was expected of her in the office, including while she was teleworking.  Ms. Smith's annual performance review for 2009 was completed in February 2010.  Mr. Tait served as the Rating Official for this review and rated Ms. Smith "outstanding" in all four of her CPE's, including a new CPE, "Provides administrative support to Assistant Director and [EARS]."  Ms. Smith's overall rating was "outstanding."

29.     In his comments to her 2009 performance review, Mr. Tait commended Ms. Smith's innovative thinking, responsiveness, and strong working relationship with the entire office.  Mr. Tait wrote: "Ms. Smith is continually evaluating practice and procedures, and making recommendations on alternative approaches.   She demonstrates an excellent understanding of the role, mission, and objectives of the EARS program and is not afraid to think 'outside the box' to make improvements.  She works very well with the Assistant Director and Deputy Assistant Director [and] is very attentive to their requests for special projects."

30.     Ms. Smith's annual performance review for 2010 was completed in January 2011.  Mr. Tait again rated Ms. Smith "outstanding" in all four CPE's, including "Provides administrative support to Assistant Director and [EARS]."  Ms. Smith's overall rating was "outstanding."

7

31.     In his comments to her 2010 performance review, Mr. Tait again emphasized Ms. Smith's work ethic and her strong working relationship with the Assistant Director and Deputy Assistant Director.   In addition, Mr. Tait lauded Ms. Smith's consistency in providing an exemplary work product.  For example, Mr. Tait wrote that "[v]ery few formatting errors, typos, or mistakes in the routing of reports occurred during the rating period.  In fact, the reviewing official cannot recall any instance when a draft report was returned for changes during the rating period."

32.     Mr. Tait also highlighted Ms. Smith's ability and willingness to serve in new roles and take on new responsibilities.  Mr. Tait wrote that "[d]uring the rating period she served as the Legal Assistant for the Central District of Illinois evaluation.  She did an outstanding job and the Team Leader has requested her services again in the future."

33.     In 2011, Mr. Tait left EARS.  Mr. Tait was replaced by Debora Cottrell.  Mss. Smith and Cottrell had a good working relationship, just as Ms. Smith had with Mr. Tait.

34.     In March 2011, Karen Winzenburg joined the EARS staff as Assistant Administrative Program Manager.   As an Assistant Administrative Program Manager, Ms. Winzenburg had no direct supervisory authority over Ms. Smith or any of the other staff members.

35.     From the beginning, Ms. Winzenburg, a Caucasian, distanced herself from the African-American staff, including Ms. Cottrell.  Nevertheless, Ms. Smith attempted to develop a friendship with Ms. Winzenburg.  In early 2012, Ms. Smith confided in Ms. Winzenburg.  Ms. Smith had been diagnosed with polycystic ovary syndrome ("PCOS"), a hormonal disorder causing enlarged and cystic ovaries.  Ms. Smith shared with Ms. Winzenburg that she was having related issues, such as painful menstruations, and that she was considering a

hysterectomy.  Since her teenage years, Ms. Smith's PCOS has caused her weight gain and, since approximately the early 1990's, Ms. Smith has been morbidly obese.

36.     While Ms. Cottrell was her supervisor, Ms. Smith continued to be recognized as a high-performing member of the EARS team.  Ms. Smith's annual performance review for 2011 was completed in February 2012.  Ms. Cottrell served as the Rating Official and rated Ms. Smith "outstanding" in three out of the four CPE's, including "Provides administrative support to Assistant Director and [EARS]."  She was rated "successful," the third highest rating, for one CPE.  Ms. Smith's overall rating was "outstanding."

37.     In her comments to Ms. Smith's 2011 performance review, Ms. Cottrell expounded on Ms. Smith's numerous achievements.  Ms. Cottrell wrote that "Ms. Smith continues to do an outstanding job with the responsibilities of formatting, editing, and preparing documents for the Assistant Director and EARS. * * * During this rating period, Ms. Smith took on the task of designing the new Support Staff Questionnaire using Opinio software.  With a short turnaround, she delivered an outstanding product.  Ms. Smith spent additional time, outside her normal working hours, mastering the software."  Ms. Cottrell also remarked on Ms. Smith's problem-solving and cooperative nature.  Ms. Cottrell wrote that "Ms. Smith seeks out innovative solutions to issues that have arisen and is dedicated to collaborating with fellow employees to establish better work processes and improve customer service. * * * She pro-actively works to exceed customer expectations by providing great service and innovative solutions before issues start arising for the customer."

38.     In mid-2012, the office environment radically changed for the worse for the African-American staff, including Ms. Smith.  On May 7, 2012, Dayle Elieson, a Caucasian,

assumed the position of EARS Assistant Director, replacing Bernie Delia as Ms. Cottrell's first-line supervisor and Ms. Smith's second-line supervisor.

39.     At this time, the EARS support staff over whom Ms. Cottrell had supervisory authority consisted of four individuals located in Washington, DC.  The four individuals in DC were Mss. Smith, Renee Parker, and Katrina Jones, all African-Americans, and Joyce Moak, a Caucasian.

40.     Upon her arrival to the EARS office, Ms. Elieson expressed a desire to restructure EARS support staff processes.  Mss. Winzenburg and Elieson immediately became close friends and collaborators and together the two worked to overhaul the office.  This included changing the Critical Performance Elements against which the staff was rated; newly added CPE's included "Professionalism" and "Customer Service."  In addition, this included an effort to remove all of the African-American staff under Ms. Elieson's supervision.

41.     First, Mss. Elieson and Winzenburg pushed Ms. Cottrell out of the office within, approximately, a six-month period of time.  Soon after Ms. Elieson arrived to the office, Ms. Cottrell had requested to telework because of a disability.  Ms. Cottrell needed surgery on her back.  Her doctor had said that, to prepare for surgery, Ms. Cottrell needed to stay at home and rest in order to keep the swelling down in her lower extremities.

42.     Ms. Elieson denied Ms. Cottrell's telework request.  Therefore, Ms. Cottrell was forced to take leave and when she was put on leave restriction, Ms. Cottrell struggled to come into the office.  One day, Ms. Cottrell fell down the stairs while trying to get into office. Ms. Smith saw Ms. Cottrell's legs swell after this incident.

43.     Ms. Cottrell filed an EEO complaint for racial discrimination and denial of reasonable accommodation.  However, Ms. Cottrell was soon retaliated against and in the early

fall of 2012 she was sent home pending termination.  Ms. Cottrell believed that she had no other option but to retire.  The office eventually settled her EEO complaint.  After she left EARS, Ms. Cottrell had her necessary surgery.  She is now employed as a contractor for the Department of Homeland Security.

44.   In October 2012, after Ms. Cottrell had been pushed out of EARS, Ms. Winzenburg replaced Ms. Cottrell as the temporary Acting Administrative Program Manager. Ms. Winzenburg began directly supervising the EARS support staff, including Ms. Smith.

45.   Once Ms. Winzenburg had assumed Ms. Cottrell's supervisory authority, Ms. Elieson and she continued to radically restructure the office and push out the remaining African-American support staff.

46.   Both Mss. Smith and Parker began suffering in the hostile work environment from racial discrimination, increased surveillance, and workplace sabotage.  Ms. Parker's experience, which involved her filing two EEO complaints, culminated in her firing in 2016. Meanwhile, Ms. Moak, the sole Caucasian support staff, has been promoted.

47.   In 2012, Ms. Winzenburg stopped having Ms. Smith sign annual situational telework agreements.  Although neither Ms. Smith's title nor position description changed, Ms. Winzenburg began treating telework as a benefit that she could withhold from the African-American employees.  In sharp contrast, Ms. Winzenburg allowed Ms. Moak to telework from Mississippi whenever she needed to go there to care for her sick mother, often for months at a time. Ms. Moak, a paralegal specialist, had similar responsibilities to Ms. Smith.  Like Ms. Smith, Ms. Moak was responsible for responding to ad-hoc requests from non-support staff members, including Ms. Elieson, and was responsible for answering the telephones.  Ms. Moak was not subjected to increased surveillance while teleworking.

48.     In late 2012, Ms. Smith began having severe pain in her back.  On December 3, 2012, Ms. Smith took FMLA leave for a physical examination by Dr. Imelda Miranda, her internal medicine doctor.  Dr. Miranda ordered an x-ray, diagnosed her with osteoarthritis in her back, and recommended that she take the x-ray to Dr. Peter Moskovitz, an orthopedic doctor specializing in the musculoskeletal system.

49.     On December 12, 2012, Ms. Smith went to Dr. Moskovitz.  He examined the x-rays and diagnosed Ms. Smith with degenerative spondylolisthesis, a spinal disorder caused by the osteoarthritis in Ms. Smith's back in which a vertebra slips forward onto the bone below.

50.     On December 18, 2012, Dr. Moskovitz wrote Ms. Smith's supervisors a note stating that Ms. Smith was partially disabled and that she was to do "no lifting/stooping."

51.     On January 10, 2013, Ms. Smith scanned Dr. Moskovitz's note and the report of her diagnosis of spondylolisthesis and e-mailed them to Ms. Elieson.  Ms. Elieson came to Ms. Smith's desk and acknowledged receipt of the information.  Ms. Elieson then stated that she was unsure why the information had been shared with her.  Ms. Smith explained that soon she would have to undergo treatments for her back, including physical therapy, and that Ms. Elieson should know why she was taking leave.  Ms. Smith asked Ms. Elieson to keep the information in her files.

52.     Ms. Smith's annual performance review for 2012 was given in March 2013.  Ms. Elieson served as the Rating Official for this review.  For the first time in 26 years, Ms. Smith was rated "outstanding" in only one of her CPE's.  For the first time in 26 years, her overall rating was "successful."  These ratings were a significant decrease from the exceptional performance reviews she had received throughout her long career in federal service.  Ms. Smith's

work performance had not changed in 2012.  Ms. Moak did not receive lower performance reviews under Ms. Elieson.

53.     In her comments to Ms. Smith's 2012 performance review, Ms. Elieson still noted Ms. Smith's impressive work ethic and product: "Allison has done an outstanding job in providing user support and training.  As the software has migrated from using WordPerfect to Word, Allison has supported the EARS staff in many ways.  She is always available to answer questions.  She has given tips and techniques on a regular basis in staff meetings.  And she has changed many of our forms to eliminate frustrations from others.  She also helps solve problems related to our computer systems, in many cases eliminating the need to contact PCAssist.  This type of service is very helpful, and it saves time and resources.  Allison has also learned more about the Opinion [sic] survey software and the E2 travel system, and is willing to serve as a backup in the areas when needed."

54.     Throughout 2013, Ms. Smith was in treatment for her degenerative spondylolisthesis.  This treatment involved physical therapy for which Ms. Smith took sick and annual leave.

55.     Ms. Smith also received pain management medication therapy during this time period.  Although Ms. Smith was originally prescribed Motrin 600, four times a day, to help with the discomfort, this dosage kept her in a constant state of drowsiness and provided her little pain relief.  Ms. Smith returned to Dr. Miranda to find the right medication.  Ms. Smith was then prescribed Tramadol, which helped tremendously.  However, Ms. Smith was unable to stay awake to drive or work while taking Tramadol.  Therefore, Ms. Smith returned to taking Motrin 600, twice a day.  Although she has been in constant pain over the past three years, she has

avoided the more effective medication during the day in order to ensure that her work performance did not suffer due to drowsiness.

56.     As a result of the relentless and severe pain in her back, Ms. Smith was forced to stop using public transportation.  Ms. Smith was unable to walk the distance necessary to take public transportation and she could no longer risk having to stand if there were no available seats.  Both walking and standing significantly exacerbated the pain in her back.

57.     Ms. Smith received her annual performance review for 2013 in February 2014. Ms. Winzenburg served as the rating official and, just as Ms. Elieson had done the year before, rated Ms. Smith "outstanding" in only one CPE, "successful" in the remaining CPE's, and "successful" overall.

58.     Nevertheless, in her comments to Ms. Smith's 2013 performance review, Ms. Winzenburg still noted Ms. Smith's impressive work ethic and product.  Ms. Winzenburg wrote: "Allison was tasked with creating a new EARS website based on input from the EARS staff and some evaluators.  She was asked to stand up a site that was completely different from the on[e] that had been in existence for a number of years.  Allison did an outstanding job creating the new website.  It was developed within the required timeframe and with all requests from the EARS Assistant Director and staff incorporated. * * * After working diligently on the site for approximately two months, the site went live on December 23, 2013.  She also spent considerable time troubleshooting quirks of the software to meet the requested requirements of the organization of the website's information and was successful in obtaining desired results. Allison has done an outstanding job in keeping the office staff abreast of the new administrative requirements concerning the switch from WordPerfect to Microsoft Word using information provided from the attendance in the train-the-trainer meetings, training through Admin, and

knowledge gathered through being a part of the IT team in the afternoons.  Allison also worked part-time for the EOUSA Office Automation Staff * * *.ö

59.    In the spring of 2014, Ms. Smith suffered a significant physical setback when she was diagnosed with severe osteoarthritis in her knees and experienced a degenerative meniscal tear.  For nearly five months while Ms. Smith was recovering and undergoing treatment, Mss. Elieson and Winzenburg denied Ms. Smith the ability to telework.  Therefore, Ms. Smith was forced to use up all of her leave and go into a significant leave deficit.  Ms. Smith pleaded with Mss. Elieson and Winzenburg to allow her to telework over this period of time, requesting to telework repeatedly.

60.    Ms. Smith had successfully teleworked in the past and could have successfully teleworked at this time.  This is demonstrated by the fact that while Ms. Smith was out of the office these five months, her duties were spread amongst other team members working remotely.  For example, Patrick Vincent, who worked out of Texas and California, performed Ms. Smithøs scheduling and survey editing duties.

61.    On April 2, 2014, Ms. Smith felt a sharp pain in her left knee and left work tiptoeing to her car.  Ms. Smithøs pain was so severe that she could not walk without using a walker.  She had difficulty even getting to the restroom.

62.    The next day, on April 3, 2014, Ms. Smith called in sick and went to the emergency room.  At the emergency room, the doctors took x-rays of her knee and ordered an MRI.  The emergency room doctor explained to Ms. Smith that she had severe arthritis and referred her to an orthopedic doctor at Southern Maryland Hospitaløs Capital Orthopaedic Specialists.

63.     In the early morning of April 4, 2014, Ms. Smith called Ms. Elieson to request to telework that day, but Ms. Elieson did not pick up.  Ms. Smith then e-mailed Mss. Elieson and Winzenburg with the subject, "Telework Today?"  Ms. Smith wrote: "I am still having trouble with my leg.  I went to the emergency room and they see severe arthritis and have referred me to an orthopedic doctor [whom] I have an appointment with next Wednesday.  However, they agitated it more and I'm barely making it to the rest room.  I'd like to request situational telework to take care of the following task[s] * * *."  An hour later, Ms. Winzenburg responded: "Allison- it sounds like you are not feeling well, so should be on sick leave.  I will approve either sick or annual leave for today.  I hope you feel better soon."

64.     Ms. Smith was forced to take leave until her appointment on April 9, 2014, with an orthopedic doctor at Capital Orthopaedic Specialists, Dr. Leonid Selya.  Dr. Selya performed additional tests, diagnosed Ms. Smith with a degenerative meniscal tear with chondromalacia in her left knee caused by severe osteoarthritis, and gave her a cortisone shot to assist with the pain.

65.     However, Ms. Smith's pain worsened.  On April 10, 2014, Ms. Smith again e-mailed Ms. Winzenburg to request telework.  Ms. Smith wrote: "My test showed yesterday that because of my arthritis, which first started [w]recking havoc on my back and is moving down my legs, there are loose bone fragments floating around in my knee.  The doctor has explained that they sometimes get lodged in the wrong place which is causing the pain.  The first line [o]f treatment is a cortisone shot which is supposed to alleviate the pain immediately, but in my case caused more pain which left me in dire [straits] all last evening.  So now a MRI must be done to show exactly where these floaters are and how they can be handled to alleviate the pain."  Ms. Smith explained that she was physically unable to come into the office at least until after her next appointment at Capital Orthopaedic Specialists on April 29, 2014.

66.      In every practical sense, Ms. Smith had lost the use of her left leg.  Ms. Smith's

brother, sister, and nephew alternated taking care of Ms. Smith and driving her to appointments.

Ms. Smith requested 80 hours of advanced sick leave if Ms. Winzenburg was unwilling to allow

her to telework.  Ms. Smith ended her April 10, 2014, e-mail with the following: "Here's [a]

website that explains my condition: http://www.mdguidelines.com/loose-bodies-knee.  This is

just info [as] I'm not looking to [retire] on disability.  I have too many plans."

67.      There was no response, either by e-mail or telephone, from Ms. Winzenburg for a

week.  Ms. Smith was left in the dark and was unable to telework from home.  During this time,

she was forced to take leave.

68.      On April 17, 2014, Ms. Winzenburg e-mailed Ms. Smith back and copied Ms.

Elieson.  Ms. Winzenburg wrote: "Your request for telework is not approved."

69.      Beginning at this time, Ms. Winzenburg and Ms. Elieson regularly copied one

another on their e-mails to Ms. Smith.  Ms. Smith also regularly copied one supervisor when e-

mailing the other.  In the rare case that one supervisor was not on an e-mail, the other supervisor

regularly ensured the other saw it by forwarding the e-mail.

70.      On April 29, 2014, Ms. Smith returned to Capital Orthopaedic Specialists for an

MRI.  Dr. Steven Webber saw Ms. Smith and explained that he did not recommend knee

replacement surgery at that time.   Dr. Webber said that he could recommend no other

alternatives and that Ms. Smith would have to adjust to being 50 with osteoarthritis that would

only get worse.  Ms. Smith immediately sought a second opinion at the Rockville Pain Relief

Center.   There, Dr. Avram Weinberg recommended that she receive Supartz injections, a

standard hyaluronic acid treatment, in her knees twice a week to rebuild the diminished cartilage.

71.     On May 6, 2014, Ms. Smith e-mailed Ms. Winzenburg and requested 80 hours of advanced annual leave.  Three days later, on May 9, 2014, Ms. Winzenburg e-mailed Ms. Smith back.  Ms. Winzenburg stated that she could not approve additional annual leave, but that 80 hours of advanced sick leave had been approved.  Ms. Winzenburg wrote: "I hope you get healthy soon."

72.     On May 19, 2014, Ms. Smith began receiving injections in her knees twice a week to rebuild her knee cartilage at the Rockville Pain Relief Center.  Ms. Smith was told by Dr. Weinberg that she needed to rest and keep her knees elevated for 48 hours after an injection.

73.     On May 23, 2014, Ms. Smith e-mailed Ms. Winzenburg, explaining the procedure and again requesting telework.  Ms. Smith explained the required 48-hour rest period and her restrictions: "Both knees have to be treated and I receive my first injection on Monday in the left knee and today in my right knee.  It's like a surgery without cutting.  I'll have to rest my leg for 48 hours with a brace after each injection and there will be 6 injections in each knee.  It's painful, but a different kind of pain leading to an end result.  I am still unable to physically come to work.  It looks like I should be able to return at least part time the first week in July when the injections are over."  Ms. Smith wrote that, if Mss. Winzenburg and Elieson did not approve telework, she was requesting in the alternative 160 hours of advanced sick leave.

74.     Ms. Winzenburg e-mailed Ms. Smith back, denying Ms. Smith telework and advance sick leave.  Because Mss. Winzenburg and Elieson would not allow Ms. Smith to telework, Ms. Smith was forced to take leave without pay starting on May 19, 2014.

75.     Ms. Smith continued to be in excruciating pain and had to use a walker to move around.  She was unable to drive and was being taken care of by her family.

18

76.     On May 23, 2014, Ms. Smith again e-mailed Ms. Winzenburg to inquire about telework.

77.     On May 28, 2014, Ms. Winzenburg e-mailed Ms. Smith back.  For the first time, Ms. Winzenburg explained that she, as Ms. Smith's supervisor, had deemed Ms. Smith's position telework-ineligible because "while teleworking, it is more difficult for all involved to request and receive your assistance."  Moreover, Ms. Winzenburg critiqued Ms. Smith's use of the term "situational telework": "Additionally, the definition of 'situational' telework that you are referring to from the USAP, generally refers to 'occasional' or 'ad hoc' situations that may only take a day or afternoon.  What you are asking for is more long term than that."  Although recognizing that Ms. Smith was asking for a long-term accommodation, Ms. Winzenburg did not engage her in the required interactive process.

78.     Throughout June and July, Ms. Smith continued to be driven to her treatment appointments by her family members.  She still was unable to walk without a walker.

79.     In mid-July 2014, Ms. Smith began to return to the office.  However, as soon as Ms. Smith was in the office, Ms. Winzenburg made remarks directed at Ms. Smith's body and weight.  She told Ms. Smith that she hoped Ms. Smith would adopt a "healthy lifestyle."  Ms. Winzenburg also checked in on Ms. Smith during lunchtime while Ms. Smith was in her office and congratulated Ms. Smith on eating "healthy" foods.

80.     On August 3, 2014, Ms. Smith e-mailed Ms. Winzenburg to ask to telework from August 5 to 6, as the White House was hosting a U.S.-Africa Leaders' Summit during which there were going to be many road closures, detours, and parking restrictions downtown.  Ms. Smith wrote: "[W]ith the summit coming this week, is there any way that you would allow telework?  In my current condition driving, getting caught in traffic, or not being able to park

right on 6th street will cause many problems for me.ö  Ms. Winzenburg e-mailed back, denying the request.  She told Ms. Smith that she could adjust her working hours slightly to avoid traffic. Ms. Smith e-mailed Ms. Winzenburg back and again explained that parking was a serious concern and that she would need to take leave without pay if she could not telework.  Ms. Winzenburg responded that Ms. Smith could telework for these days.

81.    This reversal, eventually allowing Ms. Smith to telework, demonstrates that Ms. Winzenburgøs denial of telework was not based on the characteristics of Ms. Smithøs job.  Ms. Smithøs work responsibilities had not changed over this short period of time, nor had Ms. Winzenburg received any new information.

82.    On August 11, 2014, Ms. Smith sent an e-mail to Ms. Elieson requesting telework specifically as a reasonable accommodation.  Ms. Smith again explained her situation to Ms. Elieson.  Ms. Smith explained that she needed another round of the injections to continue rebuilding her knee cartilage, this time only once a week.  She requested telework for two days each week for the required 48-hour resting period.

83.    On August 12, 2014, Ms. Elieson e-mailed Ms. Smith back with a letter about her reasonable accommodation request and a questionnaire for her doctor to fill out concerning her disability.  In the attached letter, Ms. Elieson wrote: õYou specifically requested the ÷reasonable accommodationø of telework on Wednesday and Thursday this week because your doctor recommended that you need time to recover.  Telework is not a substitute for sick leave.ö

84.    Ms. Elieson continued: õWhile we appreciate your current and prior efforts to inform us of your medical condition, I am unable to make an informed decision regarding your request based solely on the medical information you have provided to this point.ö  Ms. Elieson referenced the attached questionnaire for Ms. Smithøs doctor to complete and wrote: õGenerally,

20

medical documentation is sufficient if it: 1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and 2) substantiates why the requested reasonable accommodation is needed."

85.     Ms. Smith responded the same day to Ms. Elieson's e-mail and stated that she was currently going to her doctor and would have him fill out the information requested.  Ms. Smith also pointed out that Ms. Elieson's letter had an error – Ms. Smith clarified that it was not a recommendation to rest her legs after an injection, but "[i]t's a requirement for me to rest my leg after an injection."

86.     Ms. Smith received no response from Mss. Elieson or Winzenburg.  Neither asked to speak with her over the telephone or in person.  Ms. Smith was left in the dark for a week.

87.     On August 18, 2014, Ms. Smith e-mailed Ms. Winzenburg to inform her about the injection schedule for the coming week.  Ms. Smith updated Ms. Winzenburg that she would have her doctor's questionnaire responses faxed by the following day.  Ms. Smith also asked that she be able to telework the upcoming week as a reasonable accommodation while waiting for a formal decision to be made.  Ms. Smith attached a note from Dr. Weinberg, dated July 22, 2014, that stated Ms. Smith was "partially disabled" and "unable to return to work for 48 hours post-treatment."  The note from Dr. Weinberg further explained: "This patient will be receiving ongoing [injections once per week] for her knees and has to rest her knees for 48 hours after treated."

88.     On August 19, 2014, Ms. Smith e-mailed the questionnaire, completed by Dr. Weinberg, to Ms. Winzenburg.  Ms. Wizenburg responded that Ms. Smith should plan to remain on leave without pay until hearing differently.

89.     In the questionnaire, Dr. Weinberg answered all of the questions posed.   The questionnaire inquired about Ms. Smith's diagnosis, symptoms, prognosis, current treatment, plans for future treatment, prescribed medications including the dosage, expectation for future medications, estimated date of recovery, when the doctor anticipated that "Ms. Smith will be medically able to return to work on a regular and full-time basis," specific physical limitations, and specific restrictions recommended as related to work responsibilities.   These questions went further than necessary and constituted an intrusion into Ms. Smith's private medical affairs.

90.     Dr. Weinberg's responses including the following: "Ms. Smith's diagnosis is osteoarthritis of the bilateral knees with a tear to the left meniscus.   Her symptoms are constant severe pain in the knees, buckling knees, and sharp intermittent pains in the knees which is severely hindering her mobility at this time. * * * Ms. Smith's prognosis is unknown at this time. The probable duration of the medical condition is also unknown at this time and the need for treatment is decided on a weekly basis.   We are currently treating Ms. Smith with pain injections and a solution used to rebuild the cartilage that has worn away in the knee.   Once she receives an injection, she is required to rest the leg injected for 48 hours.   It takes 6 months for the solution to fully harden and then another x-ray is taken to see how successful the treatment was or if she will need more injections. There is no cure for arthritis, however, we are hoping that the procedure will provide enough comfort for Ms. Smith to return to her normal activities with very limited adjustments.   She is currently wearing braces on both legs to prevent the bone on bone friction that also helps with alleviating the pain whenever she's going to be doing a lot of walking.   * * * If telecommuting is allowed in your agency, this would help her with her pain and inflammation as her treatment continues. * * * Ms. Smith's limitations as a result of this condition[ are] as follows: walking, standing, squatting, kneeling, and climbing (such as stairs)

indefinitely. * * * The[se] limitations * * * should be considered also as restrictions as it relates to Ms. Smith's work responsibilities. While her treatments continue, going beyond these limitations could result in further injury.  Possible telecommuting so she can work/rest at home would help alleviate the stress on her legs traveling to/from work while she is healing."

91.     On August 22, 2014, Ms. Smith e-mailed Ms. Winzenburg before leaving the office to inquire about the following week's schedule and request telework again.  Ms. Smith wrote: "If you have more time to review/approve my information[,] I would like to request telework for next Wednesday and Thursday.  If I read the [United States Attorneys' Procedures ("USAP")] correctly, approval starts at the first line supervisor, only moving to the next supervisor if confirmation is needed on a denial."

92.     On August 25, 2014, Ms. Winzenburg responded: "[U]nfortunately, it's not only about approving telework.  Because you asked for an accommodation, a new process is in place. See USAP for Reasonable Accommodation.  [Ms. Elieson] would like to meet [with the General Counsel's Office], then we will set a time to meet w/you.  I'm sorry for the delay, but schedules are busy."  Ms. Smith responded to this e-mail, asking for telework while the meetings took place, because "I really don't want to have another pay period with so much [leave without pay] if it's possible to avoid it."  Ms. Winzenburg responded that she would get back to her later.  Ms. Winzenburg did not set up a time to meet with Ms. Smith.

93.     On the same day, Ms. Smith followed up her reasonable accommodation request by submitting DOJ Form 100A, a form for employees to fill out to request formally reasonable accommodations, to Ms. Winzenburg.  Ms. Smith wrote: "I have osteoarthritis that has caused a tear to my meniscus in the left knee which has severely lessened my mobility and causing a great deal of pain.  I am in treatments for my condition which will hopefully restore a cushion to stop

23

the bone on bone rubbing.  Once I receive a shot, I am required to rest my leg for 48 hours after. I don̓t want to keep losing these days to leave without pay when I could be working from home. I̓m also requesting 2 permanent days to keep the swelling down once we have it under control. The solution I̓m receiving takes 6 months to harden.̈  Ms. Smith explained the urgency of the request.  She wrote: ̈This accommodation is time sensitive because as I am currently in leave without pay status.̈

94.     Ms. Smith received no response from Mss. Winzenburg or Elieson.  She was not contacted by either Mss. Winzenburg or Elieson and received no request to speak further with either of them on the telephone or in person.  On August 28, 2014, Ms. Smith contacted an EEO counselor for the first time.

95.     Ms. Smith received no communications from Mss. Winzenburg or Elieson until September 4, 2014, when Ms. Elieson e-mailed Ms. Smith a letter denying her reasonable accommodation request.    Ms. Elieson wrote: ̈This letter responds to your requests for reasonable accommodation.  After careful consideration of your requests and review of your most recent treatment documentation, which was provided on August 19, 2014, I must deny your requests for accommodation. * * * You state that your request is based on a lack of mobility due to osteoarthritis in your knees, which is being treated weekly.  This condition is also causing severe pain.  In accordance with USAP 3-5.101.001, I have been provided a copy of your most recent medical documentation dated August 19, 2014.̈  Ms. Elieson continued: ̈According to your treatment providers, the Rockville Pain Relief Center, your physical limitations include: walking, standing, squatting, kneeling and climbing (such as stairs) indefinitely. * * * You are not required to perform any of these activities in the performance of your work as a Program Support Assistant.  Additionally, granting the request would not enable you to perform the

essential functions of your position, which must be performed in the office.  A significant part of your essential job functions is to provide on-site support to the EARS Staff. * * * These are assignments that cannot be performed at home.ö  Ms. Elieson concluded the letter with an appeal to consider disability retirement: öFrom the medical documentation you provided, it is unclear if there is an end in sight for your current medical condition.  If that is the case, then you may want to look into other options, such as disability retirement.  Karin Ring, EOUSA Personnel Staff, can assist you with any questions regarding disability retirement.ö

96.     Although Ms. Smith had explicitly told Ms. Elieson in April 2014 that she did not want to retire on disability, Ms. Elieson requested that she consider this option.  This was part of the same tactic that Ms. Elieson used to force Ms. Cottrell into disability retirement.

97.     Ms. Elieson attached a completed DOJ Form 100C, used in a denial of a reasonable accommodation, to the denial letter.  Ms. Elieson wrote: öMs. Smithøs essential function of her position is to provide on-site support to the staff, which includes directing incoming calls and correspondence; routing outgoing correspondence; preparing travel authorizations and vouchers using directions and preferences provided by on-site staff; accepting daily, or more frequent, requests for assistance for a myriad of administrative support tasks.  She cannot receive or perform these tasks at home.ö  The only box checked on the form was: öAccommodation Would Require Removal of an Essential Job Function.ö

98.     On September 5, 2014, Ms. Smith e-mailed Ms. Winzenburg: öI have decided to counsel with EEO on the denial of my request for reasonable accommodations.  My first appointment is Monday, September 8th from 2:30 to 4.ö

99.     During the week of September 10, 2014, Ms. Smith was unable to go in for her treatment, because she was unable to telework, and she could not afford to take more leave without pay.

100.     During this time, Ms. Smith's pain increased.   This was the second time Ms. Smith interrupted her weekly treatments due to insufficient funds.

101.     On September 11, 2014, Ms. Smith e-mailed Ms. Elieson and requested that Ms. Elieson reconsider Ms. Smith's reasonable accommodation request.   Ms. Smith explained that Ms. Elieson was incorrect to say that none of her restrictions impacted her daily duties, because "I have to get dressed, walk stairs, and drive to reach my duty station."   Ms. Smith again explained that she needed to rest to reduce the swelling, otherwise she would be unable to heal: "The swelling is what's causing the pain and the swelling will slow my healing progress."   Ms. Smith then asked Ms. Elieson to consider her reasonable accommodation request even if it was only for six months.

102.     Around this time, Ms. Smith began to walk without using a walker, but continued to use a cane to assist in balancing herself.

103.     On September 18, 2014, Ms. Elieson e-mailed Ms. Smith a letter denying reconsideration of Ms. Smith's reasonable accommodation request.   In the body of the accompanying e-mail and in the letter, Ms. Elieson said that she "hoped" to speak with Ms. Smith in person about her denial.   This was the first time that either Ms. Elieson or Ms. Winzenburg expressed a desire to speak to Ms. Smith about her reasonable accommodation request in person.

104.     In the first paragraph of the denial of reconsideration letter, Ms. Elieson wrote: "The reconsideration request provides no indication that there is an end in sight to your physical

26

impairments. If this is still the situation, you are invited to explore the option of disability retirement." Ms. Elieson explained that Ms. Smith was only providing new arguments, and not new information, and that Ms. Smith's inability to walk had nothing to do with Ms. Smith's job responsibilities: "The information you provided from your doctor when you requested an accommodation stated that you had physical limitations including walking, standing, squatting, kneeling, and climbing (such as stairs). These actions are not required in performing your job duties. In your reconsideration request, you disagreed and stated that you had to ¬get dressed, walk stairs, and drive to reach my duty station.ø While these actions may be required for you to get to the office, they are not essential functions of your position."

105.    On September 19, 2014, Ms. Smith e-mailed Ms. Elieson, attaching a signed copy of the DOJ Form 100C and acknowledging receipt of the reconsideration. However, Ms. Smith refused to sign the denial letter. Ms. Smith explained that Ms. Elieson's letter contained a factual error, because Dr. Weinberg did not recommend, but required, her to rest her legs. Ms. Smith questioned why Ms. Elieson refused to acknowledge Ms. Smith needed to rest her legs in order to keep the swelling down. Ms. Smith again explained to Ms. Elieson that "[s]itting with my legs down and repeatedly getting up and down causes swelling." Ms. Smith commented: "You keep pointing me to retirement disability. I want to work. I need to work."

106.    A few hours later, Ms. Elieson responded to Ms. Smith and stated: "Your note reinforces to me that we need to sit down and talk about this, because this is all new information for me that you have not previously shared." Ms. Smith e-mailed Ms. Elieson back immediately and questioned which information was new to Ms. Elieson. Ms. Smith explained that both Mss. Elieson and Winzenburg had all of this information in the accommodation package that Dr. Weinberg filled out in August 2014.

107.    Soon after, Ms. Winzenburg admitted in an e-mail to Ms. Elieson that Ms. Smith had explained the impact of the swelling to her previously.

108.    On September 25, 2014, Mss. Elieson and Winzenburg called Ms. Smith for the first time to have a conversation with her about her reasonable accommodation request.  In this conversation, Mss. Elieson and Winzenburg told Ms. Smith that they needed additional medical information to make an informed decision, specifically, a prognosis and an estimate of when Ms. Smith would be able to return to work full time.  Mss. Elieson and Winzenburg explained that their goal was to get Ms. Smith into the office full-time.

109.    During the telephone call, Ms. Winzenberg asked Ms. Smith unnecessary and intrusive questions, under the guise of finding a solution for Ms. Smith to come into the office full-time.  Mss. Elieson and Winzenburg refused to acknowledge that the act of getting into work was impossible for Ms. Smith.  Ms. Winzenburg drilled Ms. Smith on her routine at home.  Ms. Winzenburg asked how she was positioned at home while teleworking.   Once Ms. Smith explained that she was in bed with her legs up, Ms. Winzenburg continued to ask exactly how she was positioned in bed.  Ms. Winzenburg asked whether Ms. Smith could just put her legs up at work and if the office could provide ice to her knee at work.  Ms. Smith explained that she had to have her legs completely elevated; that she had tried a chair but that was uncomfortable.  Ms. Smith also explained again that even if her position at home could be replicated in the office, her disability affected getting into the office.  Mss. Winzenburg and Elieson stated that her difficulty getting into the office did not affect their reasonable accommodation analysis. No other alternatives were offered to Ms. Smith.

110.    The following day, on September 26, 2014, Ms. Winzenburg came into Ms. Smith s office and began questioning the credibility of Dr. Weinberg.

28

111.     On September 29, 2014, Ms. Smith e-mailed Mss. Winzenburg and Ms. Elieson and requested that she receive a pass to park in the parking garage, because otherwise, she was being forced to park on the street in handicap parking spots.  These spots had a four-hour time limit for parking.  Therefore, every four hours, Ms. Smith had to walk outside, find a new handicap parking spot, and walk inside.  The walking and driving throughout the day to move her car caused her legs to swell and increased the pain from the osetoarthitis in her legs.  Ms. Smith explained that she had spoken to Romona Greene, the Human Resources Special Program Manager, and that Ms. Greene stated that she needed an e-mail from Ms. Elieson approving a parking pass for Ms. Smith.  Ms. Smith attached DOJ Form 100A and explained that Ms. Elieson would need to send that completed form to Ms. Greene in her approval e-mail.

112.     Ms. Elieson immediately responded that management was still dealing with Ms. Smith's telework request, and "[w]e need to finish that conversation before we start on this request."  This was a denial of Ms. Smith's request for the reasonable accommodation of parking.

113.     On September 30, 2016, Ms. Smith appealed the denial of her telework reasonable accommodation request to Suzanne Bell, the Deputy Director for Legal Management.  Ms. Smith requested that Ms. Bell reconsider her request to telework two days per week and explained that she would like to be transferred to an office that could accommodate her if her current one could not.  Ms. Smith explained that she wanted to be working full-time and also be able to manage her health.

114.     On October 3, 2014, Ms. Elieson e-mailed Ms. Smith and stated that she and Ms. Winzenburg had spoken with Facilities Staff, and that Ms. Smith must provide a note from her

doctor explaining "why you need a parking space, the nature of the condition, and the duration of the need for a parking space."

115.    On October 8, 2014, Ms. Elieson e-mailed Ms. Smith a letter approving only one day of telework per week until January 16, 2015.  Ms. Elieson listed all the justifications for granting one day of telework per week.  All of the listed justifications were facts that Ms. Elieson and Ms. Winzenburg were aware of well before the September 25, 2014, conference call – for example, that Ms. Smith was diagnosed with osteoarthritis in her knees, had a torn ligament in her left knee, and that, to heal as expeditiously as possible she needed to remain immobile and with her feet propped up to keep the swelling reduced.  Nevertheless, Ms. Elieson claimed that Ms. Smith had provided them with new information on September 25, 2014.

116.    Ms. Smith was forced to take sick leave, annual leave, or leave without pay once a week for the day for which telework was denied, in order to rest her leg as ordered by Dr. Weinberg.

117.    On October 9, 2014, Ms. Bell e-mailed Ms. Smith that she was denying Ms. Smith's informal appeal of her reasonable accommodation denial in light of the grant of one day of telework.  Ms. Bell also wrote: "I have also considered your request to be reassigned to another position which would allow you to telework two days a week as you have requested; however, I am unaware of another position in EOUSA for which you are qualified that would not require you to be present in the office to perform your duties."

118.    On October 16, 2014, Ms. Smith e-mailed Dr. Weinberg's note, dated October 13, 2014, to Mss. Elieson and Winzenburg about her need for parking to be provided to her as a reasonable accommodation.  Dr. Weinberg wrote: "Ms. Smith requires a parking pass due to her degenerative knees causing her disability and affecting her ability to walk any distance."  In the

e-mail accompanying Dr. Weinberg's note, Ms. Smith wrote: "I'd like to request a parking pass in the BICN Building located at 600 E Street NW, WDC 20530.  I suffer from Osteoarthritis in both knees and have a torn ligament in my left knee at this time.  My mobility is restricted and it is too difficult to go outside everyday to move my car from space to space."  Ms. Smith continued: "This accommodation is time sensitive because the handicap placard I have only allows 4 hours in one spot.  Each time I don't move, I'm subject to a $25 parking ticket.  I have attached a note from my doctor to aid in this request."

119.    Ms. Smith received no communication from either Mss. Elieson or Winzenburg for five days.

120.    On October 22, 2014, Ms. Smith e-mailed Ms. Elieson and copied Ms. Winzenburg, asking for an update on her request for parking.  Ms. Elieson responded to Ms. Smith, copying Ms. Winzenburg, "I do not have an answer for you yet, but hope to soon.  As previously mentioned to you, I don't get to make the decision alone or in a vacuum."

121.    On October 27, 2014, Ms. Smith e-mailed Ms. Elieson, asking whether they could reach a resolution concerning parking that week.  Ms. Elieson responded that she expected Ms. Smith to receive an answer in the upcoming week.

122.    On October 29, 2014, Ms. Elieson e-mailed Ms. Smith a denial letter for parking: "EOUSA does not routinely provide paid parking to its employees; instead, it offers a transit incentive benefit to encourage employees to use public transportation."

123.    On October 31, 2014, Ms. Smith e-mailed Ms. Elieson to request reconsideration of the denial of her request for a parking pass.  Ms. Smith again reiterated that her request was based on her mobility impairment due to her osteoarthritis.

124.    On November 10, 2014, Ms. Smith e-mailed Ms. Winzenburg and told her that the addition of the Hotel Program to her workload created an unbearable amount of work for her. Ms. Smith stated: "It seems that new tasks are being passed on to me weekly and I'm trying to keep the pace at this time."  Ms. Winzenburg e-mailed Ms. Smith back that this was not too much work for her.

125.    On November 12, 2014, Ms. Smith entered into EEO mediation with Mss. Winzenburg and Elieson.  Mediation was unsuccessful.

126.    On November 17, 2014, Ms. Elieson denied reconsideration of the denial for Ms. Smith's parking.  Ms. Elieson said that garage parking and valet services were available to Ms. Smith if Ms. Smith paid for them.  Ms. Elieson said that Ms. Smith's financial situation, and her inability to pay for these services herself, was not a basis for EOUSA to grant her the reasonable accommodation.

127.    On November 19, 2014, Ms. Winzenburg e-mailed Ms. Smith and asked her to take lunch at a different time than Ms. Parker, because Mss. Smith and Parker usually ate lunch at the same time.  However, Ms. Parker would leave the building and Ms. Smith would eat lunch at her desk, because she was in too much pain to walk.  Ms. Smith would remain at her desk with her door closed during her lunchtime.  This way, Ms. Smith could continue to do work if it was needed.

128.    Ms. Smith e-mailed Ms. Winzenburg back and asked if it would help if she kept her office door open during lunch.  Ms. Winzenburg responded immediately that she did not understand why Ms. Smith was arguing with her.   Ms. Smith acquiesced and agreed to coordinate lunches with Ms. Parker.  By forcing Mss. Parker and Smith to take lunches at different times, Ms. Winzenburg was pitting Mss. Parker and Ms. Smith against one another.

Both Mss. Parker and Smith enjoyed that time to take lunch, because that was the slow time of their day.  However, if they were unable to take it at the same time, either Mss. Parker or Smith would feel rushed and uncomfortable during their lunchtime.   Ms. Smith began taking lunch earlier and was forced to work through each lunch.

129.    On December 4, 2014, Ms. Smith filed a formal EEO complaint for discrimination.

130.    On December 4, 2014, Ms. Smith requested parking from the parking coordinator, Preston Simpkins.

131.    On December 9, 2014, Ms. Smith e-mailed Ms. Bell and explained that Ms. Elieson denied her request for parking.  Ms. Smith explained that Mr. Simpkins needed her supervisor's approval for her application, and that Ms. Elieson had refused to give her approval.

132.    The next day, on December 10, 2014, Ms. Bell forwarded the e-mail to Ms. Elieson.

133.    A week passed, during which Ms. Smith heard nothing from either Mss. Elieson or Winzenburg.

134.    On December 17, 2014, Ms. Winzenburg e-mailed Ms. Smith and stated that she had been forwarded Ms. Smith's request as Ms. Smith's first-line supervisor.  Finally, Mss. Winzenburg and Smith met, and Ms. Smith gave Ms. Winzenburg Dr. Weinberg's note.  Ms. Winzenburg signed her approval for the parking pass.

135.    In January 2015, Ms. Smith was given parking for the entire year from Mr. Simpkins.

136.    On January 12, 2015, the office was on a two-hour delay, because of poor weather conditions.  At the beginning of the morning, Ms. Smith requested unscheduled telework for the day.  Ms. Winzenburg denied the request.

137.    On January 14, 2015, all office employees were offered the option to telework, because of poor weather conditions.  Ms. Smith e-mailed Ms. Winzenburg that she would like to utilize the telework option.  Ms. Winzenburg responded skeptically about the work that Ms. Smith would be doing during the day at home and requested that Ms. Smith provide an end-of-the-day report.

138.    On January 16, 2015, Ms. Smith's reasonable accommodation of one day of telework per week ended.   Ms. Smith requested a short extension of the reasonable accommodation for her to provide updated medical information, which was granted.

139.    On January 19, 2015, Dr. Weinberg performed new examinations and x-rays of Ms. Smith's knees.

140.    Ms. Smith informed Ms. Winzenburg that Dr. Weinberg was in the process of updating the report of her current medical condition.

141.    On January 27, 2015, the office had a two-hour delay and gave employees the option of teleworking, because of poor weather conditions.  Ms. Smith e-mailed Ms. Winzenburg and requested unscheduled telework.  Ms. Smith explained: "It is too slippery outside and I am still healing."  Ms. Winzenburg denied Ms. Smith's request, stating that she would only approve unscheduled leave for the day.  Ms. Winzenburg wrote: "When OPM offers a telework option it is always at the discretion of the supervisor, not merely something to be invoked by the employee.  Your request to telework today is denied.  You may take unscheduled leave if you would like to do so."  Ms. Smith was forced to take unscheduled leave for the day.

142.    On January 30, 2015, Ms. Smith e-mailed Ms. Winzenburg, asking for an extension of her reasonable accommodation for six more months and increasing the days she teleworked from one to two days per week.  Ms. Smith provided Dr. Weinberg's updated report, dated January 28, 2015, which indicated that she would need approximately five more weeks of Supartz treatments on her left knee.  Ms. Smith explained: "I will need more treatments as the tear in my left knee hindered the treatment from being as successful as it was in the right knee.  Since it is just for the left knee, I'm trying to get as many of my treatments on Friday in order to have a better work week.  Please note that there may be times that I can't get the Friday and will be out 3 days during the week.  If this occurs, I request that I be allowed two of those days to telework while resting my leg.  I would like to request 80 hours of advanced sick leave to cover the days that I will be out an[d] any subsequent days where I may need pain treatment, follow-up, or physical therapy.  This will give me a chance to earn some annual leave to have for other emergencies that may occur such as inclement weather since you explained that the signed telework agreement for 2015 will not be honored for situational telework portion.  I would like to request that once the treatments are done that I have one day of telework a week for 6 months to help battle the swelling."

143.    Dr. Weinberg's letter explained that Ms. Smith's left knee needed five more weeks of treatment, because the meniscal tear caused the knee to respond poorly to the treatment.  Dr. Weinberg wrote: "This [knee] has a torn meniscus and did not respond as well to her initial treatment of Supartz injections and physical therapy.  She will be receiving treatment at our office once per week for five weeks with a required ‑rest period‑of 48 hrs after each treatment.  I understand she now works Monday, Wednesday and Fridays, but she will only be able to work two days per week during this five week treatment period."

35

144.    A week passed, during which Ms. Smith heard nothing from either Mss. Winzenburg or Elieson.

145.    On February 6, 2015, Ms. Winzenburg denied Ms. Smith's request to telework two days per week.  Ms. Winzenburg said that Ms. Smith could continue to telework one day a week during the five-week treatment period.  Ms. Winzenburg denied Ms. Smith's request to be advanced 80 hours of sick leave.

146.    On February 9, 2015, Ms. Smith asked Ms. Winzenburg to clarify her eligibility for situational telework.  On February 10, 2015, Ms. Winzenburg stated that Ms. Smith had only been approved for telework in connection with her reasonable accommodation request, but that her position was still not telework eligible.

147.    On February 17, 2015, Ms. Smith requested to add an extra half day for teleworking on Fridays.  Ms. Smith explained that she began receiving her injections on Friday mornings and needed time to rest her leg on Friday afternoons.

148.    On February 18, 2015, Ms. Winzenburg denied Ms. Smith's request to add an extra half day for teleworking on Fridays.

149.    In February 2015, Ms. Smith had her 2014 annual performance review.  Ms. Smith received an overall successful rating for 2014, but was told by Ms. Winzenburg that if she did not find a way to work better with Ms. Elieson, she would be subject to being placed on a Performance Improvement Plan ("PIP") and that she "wouldn't want something like that to happen after having such a successful record over your [long] service to the government."  This veiled threat indicated to Ms. Smith that if she did not drop her reasonable accommodation requests, she would be placed on a PIP and slowly pushed out of the office.  As explained above,

two other African-Americans in the office Mss. Cottrell and Parker were subjected to this pattern of removal from the office.

150.    On March 6, 2015, Ms. Smith's five-week extension of her reasonable accommodation request expired.

151.    On March 9, 2015, Ms. Smith requested telework for Thursday and Friday as she had to move her doctor's appointment to Wednesday because of poor weather conditions.  Ms. Winzenburg denied Ms. Smith's request to telework for two days and instead approved leave for two days.

152.    On March 12, 2015, Ms. Winzenburg e-mailed Ms. Smith warning her that if she did not return to work the next Monday full-time, Ms. Smith would be subject to termination. Ms. Winzenburg also included a medical information request and demanded an entirely new assessment to be conducted of Ms. Smith, even though Ms. Smith had previously provided Ms. Winzenburg and Ms. Elieson with sufficient information to substantiate her disability and her need for the requested accommodations.

153.    In addition, Ms. Winzenburg attached a questionnaire with questions to be answered by Ms. Smith's doctor. These questions varied significantly from the questions Ms. Smith was asked to have her doctor answer in August 2014 and were of an intrusive and highly inappropriate nature.  For example, Ms. Smith's doctor was asked what other treatments Ms. Smith had been given or recommended, and specifically asked whether Ms. Smith had been recommended exercise.

154.    On March 13, 2015, Ms. Winzenburg responded to Ms. Smith's e-mail, stating that the letter provided to her from Dr. Weinberg was insufficient.  Ms. Winzenburg contended: "Other than stating you received a 'round of Supartz treatments' and that your [sic] will be

"partially incapacitated from March 11, 2015 until September 1, 2015" when you will be "reevaluated," the letter provides very little information regarding your medical condition and need for telework." Ms. Winzenburg directed Ms. Smith to have her doctor complete the March 12, 2015, questionnaire.

155.    Ms. Smith quickly responded to Ms. Winzenburg and corrected her that Dr. Weinberg's letter "states that telework is recommended to battle the swelling while the Supartz is solidifying over the next 6 months." Ms. Smith said that she did not dispute providing additional information from Dr. Weinberg, but that turnaround was too short.  Ms. Winzenburg responded: "Allison – I will consider your request when my request for additional information, as outlined below, is received. Please let me know if you don't understand what's being requested."

156.    Mss. Winzenburg and Elieson's continued and unwarranted skepticism of Ms. Smith's doctor and treatment resulted in unnecessary delays in issuing Ms. Smith a reasonable accommodation.  It also constituted bad faith with regards to the interactive accommodation process.

157.    On March 18, 2015, Ms. Smith e-mailed Ms. Winzenburg the completed questionnaire from Dr. Weinberg.

158.    On March 23, 2015, Ms. Smith met with Ms. Winzenburg to discuss her reasonable accommodation request.

159.    On March 30, 2015, Ms. Smith was given a letter from Ms. Winzenburg, stating that she could telework for two days a week until September.  In the letter, Ms. Winzenburg wrote: "In light of this additional information [from Dr. Weinberg] I have decided to grant your request for telework for two days per week, beginning today, until September 11, 2015, which is approximately six months from the date you completed the treatment on your knees. The days

you will telework are every Tuesday and Thursday working your regular tour of duty of 9:00am to 5:30pm.  You will not be permitted to change the telework to another day during the week. * * *  Prior to leaving work on Mondays and Wednesday, you will be required to meet with me to discuss the tasks you plan to work on your Tuesday and Thursday, respectively, telework day.  If I am not available, you are to e-mail this information to me before leaving the office.  You will also be required to provide to me a detailed report at the end of each telework day setting forth the tasks you completed broken down in hour increments. * * * This report should be sent to me no later than 5:30pm each day you are teleworking. This report must be sufficiently detailed so that I am easily able to determine the work you have accomplished for the day and how long it took you to accomplish this work. * * *  In the event your performance falls below the successful level, you may be placed on a Performance Improvement Plan.ö  The information provided to Ms. Winzenburg at this time was no different than the information provided to Ms. Winzenburg earlier.   Ms. Winzenburgøs increase in surveillance over Ms. Smithøs work and Ms. Winzenburgøs threat of placing Ms. Smith on a Performance Improvement Plan demonstrate her hostility towards Ms. Smith and the reasonable accommodation process.  Ms. Smith had not been subjected to increased surveillance while teleworking under Mr. Tait.

160.    In early summer 2015, Ms. Winzenburg transferred to the front office.   Ms. Amanda Rose, a Caucasian, replaced Ms. Winzenburg.

161.    Ms. Smith successfully teleworked for two days per week from March 30, 2015, until September 11, 2015.

162.    Mss. Elieson and Winzenburgøs excuses for denying Ms. Smith telework for 2014 and 2015 on the ground that Ms. Smithøs job was not suitable for telework is belied by their decisions to allow Ms. Smith to telework, first for one day a week and later for two days a week.

There is no indication that any employees of EARS concluded that Ms. Smith's assistance to them when she teleworked was deficient in any way.

V

**CLAIMS**

A.      **FIRST CLAIM: Failure to Provide the Reasonable Accommodations of Telework and a Parking Pass (Rehabilitation Act)**

163.      The Rehabilitation Act, 29 U.S.C. 791, and regulations promulgated thereunder, require agencies of the Federal Government to provide reasonable accommodations to qualified individuals with disabilities.

164.      At all relevant times, namely since April 2014, Ms. Smith has been a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. 791.

165.      In 2012, Ms. Smith was diagnosed with osteoarthritis and degenerative spondylolisthesis in her back and, in 2014, Ms. Smith was diagnosed with osteoarthritis in both her knees after she suffered a degenerative meniscal tear with chondromalacia in her left knee. For five months in 2014, Ms. Smith temporarily lost the use of her left leg.

166.      The symptoms of these conditions significantly impaired many of her major life activities, including walking, standing, driving, and caring for herself.

167.      Despite Ms. Smith's disabilities, Ms. Smith has been able, with or without reasonable accommodation, to perform the essential functions of her job for the Agency.

168.      At all relevant times, the Agency was aware of Ms. Smith's disabilities and was regularly provided with medical reports and other relevant documentation.

169.      Since April 2014, Ms. Smith repeatedly requested reasonable accommodations. Ms. Smith asked for the opportunity to telework, for reassignment, and a pass to park in the parking garage.

170.    The Agency repeatedly denied Ms. Smith these reasonable accommodations.

171.    As a result of the Agency's denials, Ms. Smith has suffered and is suffering injuries, including exacerbation of her disabilities, emotional distress, loss of present and future earnings, and other financial damages such as loss of leave and denial of a promotion to the next grade level.

## B.    SECOND CLAIM: Failure to Engage in, and Interference with, the Interactive Accommodation Process (Rehabilitation Act)

172.    The Rehabilitation Act, 29 U.S.C. 791, and regulations promulgated thereunder, require agencies of the Federal Government to engage in an interactive process when a qualified individual with a disability requests a reasonable accommodation.

173.    At all relevant times, namely since April 2014, Ms. Smith has been a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. 791.

174.    Throughout 2014 and 2015, Ms. Smith repeatedly requested reasonable accommodations.  The Agency refused to engage in an interactive process, acted in bad faith, and required unnecessary private medical information.

175.    As a result, Ms. Smith has suffered and is suffering injuries, including exacerbation of her disabilities, emotional distress, loss of present and future earnings, and other financial damages, such as loss of leave and denial of a promotion to the next grade level.

## C.    THIRD CLAIM: Race Discrimination – Disparate Treatment (Title VII)

176.    Title VII makes it unlawful for an employer, including the Agency, to discriminate, among other things, on the basis of race.  *See* 42 U.S.C. 2000e-2(a), 2000e-16; 29 C.F.R. 1614.101(a).

177.    Ms. Smith is African-American and is qualified for her position.

178.    As set forth above, the Agency discriminated against Ms. Smith on the basis of race by, *inter alia*, denying her reasonable accommodations and failing to engage in an interactive accommodation process while granting those same accommodations to similarly situated Caucasian employees, lowering her performance review ratings without justification, and engaging in increased workplace surveillance.  Any assertion otherwise by the Agency is pretext to hide discriminatory animus.

179.    The Agency's actions were intentional and were motivated by Ms. Smith's race.

180.    Ms. Smith's experience is consistent with the experiences of all of the African-American staff members under the same supervisors.  Ms. Smith demonstrates a pattern of discrimination against African-Americans in the EARS office by these supervisors.

181.    The Agency's actions caused Ms. Smith loss of pay, loss of retirement and other benefits, medical costs and other pecuniary expenses, physical harm, emotional pain and suffering, mental anguish and anxiety, inconvenience, loss of reputation and professional standing, and other non-pecuniary damages.

## VI

## RELIEF

Wherefore, Ms. Smith requests the following relief:

1.    A declaratory judgment against the Agency;

2.    An order requiring the Agency to grant Ms. Smith two days of telework per week or to reassign her to a position elsewhere in the Agency at the same grade level she is now, in which she would be granted two days of telework per week;

3.    Compensatory damages in the amount of $300,000 for emotional distress, aggravation of her disabilities, damages to health, and other non-pecuniary loss pursuant to the Rehabilitation Act, 29 U.S.C. 794a, and the Civil Rights Act of 1990, 42 U.S.C. 1981a(b);

4.      Restoration of all sick leave and annual leave which the Agency forced Ms. Smith to use during 2014 and 2015 when denying her reasonable accommodations;

5.      Reimbursement for all pay and benefits Ms. Smith has lost, because she was on leave without pay, as a result of the multiple denials of reasonable accommodations;

6.      A promotion to the next grade level;

7.      Reimbursement for her attorneys' fees and expenses pursuant to the Rehabilitation Act, 29 U.S.C. 794a, and the Civil Rights Act of 1990, 42 U.S.C. 1981a(1) and (2);

8.      Such other relief as the Court deems equitable and necessary.

## VII

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Smith demands trial by jury in this action of all triable issues (*see* 42 U.S.C. 1981a(c)).

Respectfully submitted,

  */s/ Bruce J. Terris*
BRUCE J. TERRIS, DC Bar #47126
STEPHANIE A. MADISON, DC Bar #1025581
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100, ext. 8474

June 29, 2016                          *Counsel for Plaintiff*